CAPPA FLYING CLUB, INCORPORATED v. AIR HARBOR FLYING SERVICE, INCORPORATED.

(Filed 24 May, 1961.)

**Landlord and Tenant § 7— Evidence held insufficient to show negligence of landlord in failing to protect goods of tenant from damage.**

Plaintiff rented hangar space for its planes from defendant. Plaintiff's planes were damaged when the roof of the hangar caved in after a heavy snow. The evidence tended to show that defendant had no authority with reference to the use, removal or replacement of plaintiff's planes in the hangar and that on the late afternoon before the accident plaintiff's agent and defendant's agent together inspected the hangar and observed no condition indicating that the roof was sagging or was otherwise unsafe. *Held:* The evidence is insufficient to show negligence on the part of defendant in failing to remove the snow from the roof

of the hangar, in failing to remove the aircraft to a place of safety, or in failing to provide additional support to the roof of the hangar.

APPEAL by plaintiff from *Gambill, J.,* November 14, 1960, Civil Term, of GUILFORD, Greensboro Division.

Plaintiff's two light aircraft were damaged during the night of March 2, 1960, when the roof of the hangar or shed in which they were stored collapsed, allegedly due to the weight of the snow that had accumulated thereon. Plaintiff had rented from defendant two storage spaces at a monthly rental of $7.00 per space. Plaintiff seeks to recover damages, alleging the damage to its aircraft was proximately caused by the negligence of defendant in that defendant (1) failed to remove the snow that was rapidly accumulating on the roof of the hangar, (2) failed to remove the aircraft to a place of safety, and (3) failed to provide additional supports to the roof of the hangar.

This appeal is from a judgment of involuntary nonsuit entered at the close of plaintiff's evidence.

*Rollins & Rollins and Sapp & Sapp for plaintiff, appellant.*
*Cooke & Cooke for defendant, appellee.*

PER CURIAM. Plaintiff, a nonprofit corporation, operated a Flying Club composed of 35 or 37 members. Each member was entitled to use a plane owned by plaintiff in accordance with plaintiff's "Operations Rules." When doing so, a member removed the plane from its place of storage in the hangar and was obligated to put it back. Defendant had no authority or obligation with reference to the use, removal or replacement of plaintiff's planes.

The evidence discloses plaintiff rented from defendant two *specific* spaces in a "five-bay" hangar. The contention that the relationship between plaintiff and defendant was that of bailor-bailee is not supported by plaintiff's evidence. Moreover, plaintiff, in its complaint, seeks to recover on account of negligence of defendant in the particulars therein alleged.

Admittedly, defendant did not (1) remove any snow from the roof of the hangar, or (2) remove plaintiff's aircraft from the hangar, or (3) provide additional supports to the roof of the hangar. The crucial question is whether the evidence is sufficient to support a finding that defendant, by the exercise of due care, could and should have reasonably foreseen that a collapse of the roof was likely to occur.

The structure was built in 1952 or 1953. It had no walls. It was "open all the way around on all four sides." There was no floor. It was

"just ground." Storage in this structure was for protection from sun, hail, rain, snow, etc.

Mr. Mitchell, a member of plaintiff's board of directors, had been familiar with this structure from the time it was built. He had observed snow on the roof on other occasions. No plane had been removed therefrom on account of weather conditions. According to the records of the meteorologist at the Greensboro-High Point Airport, the weather conditions on February 13, 1960, "produced more precipitation, deeper snow, and stronger wind than they did on March 2nd." There was no evidence that the roof of the hangar sagged or was otherwise affected by the weather conditions on February 13th. It is noted that the roof of the hangar, made of tin, rose from each side to a peak in an inverted "V" shape and that the angle of the peak of the roof was 30 or 40 degrees.

Mr. Mitchell was *plaintiff's* maintenance man. He went to defendant's air strip twice during the afternoon of March 2nd. On each occasion, he and Mr. Brookbank, employed as a mechanic by defendant, inspected the "five-bay" hangar or shed in which plaintiff's two planes and three others were stored. They observed no condition indicating the roof was sagging or was otherwise unsafe. When Mitchell left, about 6:00 p.m., it was getting dark. Mitchell testified: "We, again, went out and inspected the hangar where Cappa's planes were. It looked OK so we decided we would go home." He testified further: "I felt it was perfectly all right to leave the planes in there when I left there at six o'clock that evening." He testified further that, as a result of his observations, *he* decided to leave plaintiff's planes in the hangar or shed. Brookbank testified: "I recall going to the hangar with Mr. Mitchell and looking at it to determine whether or not there was any evidence of strain being put on it. At that time, it appeared perfectly normal to me. There was no evidence, whatsoever, of any effect of this snow that was there on the hangar. As a result of my observations, Mr. Mitchell and I left the planes where they were. We did not take them out."

Mitchell and Brookbank left the hangar about 6:00 p.m. for their respective homes and did not return. Brookbank lived in a trailer some five hundred feet from the hangar. Mitchell lived some two and a half miles therefrom. When they left, "it wasn't snowing or anything, and the sky was beginning to look lighter, like it was going to clear up." Later, during the night of March 2nd, there was light snow, sleet and freezing rain.

There is no evidence as to when, during the night of March 2nd, the roof collapsed. The next morning, about 9:00 a.m., Brookbank discovered the roof had collapsed. It is noteworthy that when Brook-

bank advised Mitchell by telephone that the roof had collapsed, Mitchell thought Brookbank "was kidding."

It is deemed unnecessary to discuss the evidence in greater detail. Suffice to say, neither Mitchell nor Brookbank, upon careful inspection, observed any condition suggesting the roof of the hangar or shed was likely to collapse.

Close analysis of all the evidence impels the conclusion that there is no evidence sufficient to support a finding that the conditions were such that defendant, in the exercise of due care, could and should have reasonably foreseen that the roof of the hangar or shed was likely to collapse. Hence, the judgment of involuntary nonsuit is affirmed.

Affirmed.